IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**CHERYAL D. MILLICAN,**

      **Plaintiff,**

vs.                                                                   No. CIV 02-0948 WDS

**JO ANNE B. BARNHART, Commissioner**
of the Social Security Administration,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Decision filed on June 10, 2003. Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security, who determined that Plaintiff was not eligible for supplemental security income. The Court, having considered Plaintiff's Motion [docket # 11] and Memorandum Brief [docket # 12], Defendant's Response [docket # 13], Plaintiff's Reply [docket # 14], the administrative record and applicable law, finds that Plaintiff's Motion should be **GRANTED IN PART,** and that this matter should be remanded to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order.

### I. Background

Plaintiff, who was born on October 17, 1960, was employed as a ranch hand and as a cashier/checker before the onset of her alleged disability. On February 4, 1998, Plaintiff fell from a counter she had been standing on in order to change a light bulb, Tr. 237-38, and sustained a fractured left heel bone as a result of the fall, Tr. 130-31. She subsequently complained of pain in her left knee, hip, and low back. Tr. 161. Plaintiff's treating physician, Dr. Michael Federico, attributed Plaintiff's knee, hip and back pain to her "severely antalgic gait." Tr. 162. In other words, Plaintiff's

"compensatory walking" caused bursitis in her knee, hip and low back pain, and numbness in her toes. Tr. 161-62. Plaintiff also alleged that she began having panic attacks approximately six months after she fractured her heel bone. Tr. 240-41.

Plaintiff filed her initial application for supplemental security income ("SSI") under Title XVI of the Social Security Act on June 5, 2000, Tr. 46-48, and has a protective filing date of May 17, 2000, Tr. 77. Although Plaintiff alleged that she became unable to work as a result of her disabling conditions on February 4, 1998, Tr. 46, she is not eligible for benefits before her protective filing date. *See* Tr. 12. After Plaintiff's application was denied at the initial level, Tr. 28-31, and at the reconsideration level, Tr. 35-38, Plaintiff appealed by filing a request for hearing by an administrative law judge ("ALJ") on February 2, 2001, Tr. 39.

The hearing before the ALJ was held on December 6, 2001, at which Plaintiff appeared and was represented by an attorney. Tr. 222-52. Plaintiff alleged that she was disabled as a result of foot injuries, panic attacks, and knee and hip problems. Tr. 237-243. In a decision dated February 19, 2002, the ALJ denied Plaintiff's claims for SSI. Tr. 11-18. Plaintiff then filed a request for review with the Appeals Council on April 22, 2002. Tr. 6-7. The Appeals Council denied Plaintiff's request for review on May 31, 2002, Tr. 4-5, and thereby rendered the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). *See* 20 C.F.R. § 416.1481

On August 2, 2002, Plaintiff filed this action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c)(3). Both parties filed their consent, and this case was reassigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) on May 1, 2003 [docket # 10].

## II.  Standard of Review

This Court may only review the Commissioner's decision to determine whether it is supported by substantial evidence and whether correct legal standards were applied. *Andrade v. Secretary of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir. 1993).  In determining whether the Commissioner's findings are supported by substantial evidence, the Court should not re-weigh the evidence, nor should it substitute its judgment for that of the Commissioner. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).  Instead, the Court should meticulously examine the record to determine whether the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1993).  The "substantial evidence" standard is satisfied by more than a scintilla, but less than a preponderance, of evidence. *Id.*  However, evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir. 1989).

A sequential five-step analysis applies in determining whether an adult claimant is disabled and entitled to benefits under the Social Security Act. *See Williams,* 844 F.2d at 750-52; 20 C.F.R. § 416.920.  First, the question is whether the claimant is engaged in substantial gainful activity. *Williams,* 844 F.2d at 750.  If so, the claimant is not disabled; if not, the analysis proceeds to step two. *Id.*  At the second step, the question is whether the claimant has an impairment or combination of impairments that is severe. *Id.*  If not, the claimant is not disabled; however, if the claimant makes the required showing of severity, the analysis proceeds to step three. *Id.* at 750-51.  At step three, the question is whether the claimant has an impairment or combination of impairments that meets or equals an impairment listed at Appendix 1, Subpart P, of 20 C.F.R. Part 404 ("Listings" or "Listed

Impairment"). *Id.* at 751. If so, the impairment is considered to be presumptively disabling. *Id.* If not, the analysis proceeds to step four, where the question is whether the impairment prevents the claimant from doing past work. *Id.* The claimant is not disabled if he or she can perform past work. *Id.* If the claimant cannot perform past work, the analysis proceeds to step five, where the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity ("RFC") "to perform other work in the national economy in view of his age, education and work experience." *Id.* (quoting *Bowen v. Yuckert,* 482 U.S. 137, 142 (1987)). The claimant is entitled to benefits unless the Commissioner establishes that the claimant can "perform an alternative work activity and that this specific type of job exists in the national economy." *Id.* (quoting *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984)).

### III.  Summary of the ALJ's Decision

At step one of the sequential five-step analysis, the ALJ concluded that Plaintiff did not engage in substantial gainful activity on or after her SSI protective filing date. Tr. 13. The ALJ found at step two that Plaintiff's calcaneal fracture of her left foot is a severe impairment, but that her other impairments of depression and anxiety are not severe. *Id.* The ALJ found at step three that none of Plaintiff's impairments met or medically equaled any Listed Impairment. Tr. 13-14. At step four, the ALJ found that Plaintiff retains the residual functional capacity to perform a limited range of light work, Tr. 15, but that she is unable to perform her past relevant work, Tr. 16. At step five, the ALJ found that Plaintiff retains the RFC to perform the job of an accounting clerk, and that the position of accounting clerk exists in significant numbers in the regional and national economies. Tr. 16. Plaintiff contends that the ALJ erred when he assessed her credibility, when he accorded improper weight to the opinions of physicians, and when he weighed Plaintiff's participation in a

vocational rehabilitation program against her.

## IV.  Discussion

### A.  Whether the ALJ Erred in Assessing the Severity of Plaintiff's Mental Impairments At Step Two

At step two of the sequential five-step analysis, the ALJ determined that Plaintiff's mental impairments were not severe. Plaintiff contends that the ALJ committed both factual and legal errors in his analysis.

#### 1. Any Error the ALJ May Have Committed With Respect to the Weight he Assigned to Reports Completed by Dr. Journigan and Dr. Chiang was Harmless

The ALJ based his determination that Plaintiff's mental impairments were not severe, in part, upon the relative weights he assigned to an evaluation conducted by Dr. Walter Journigan and a Psychiatric Review Technique ("PRT") form completed by Dr. E. Chiang. In this regard, the ALJ noted that Dr. Journigan evaluated Plaintiff in July 2000. Tr. 13 (citing Tr. 114-120). Among other things, Dr. Journigan diagnosed Plaintiff with cyclothymic disorder, and recommended that Plaintiff should "not pursue a vocational track at this time," Tr. 118-119. However, because Plaintiff began attending college approximately one month after Dr. Journigan's assessment, did well in college, and also worked at a part-time job, the ALJ concluded that Dr. Journigan's report was not entitled to significant weight. Tr. 13. As additional support for his step two determination, the ALJ cited the fact that in a PRT form prepared in December 2000, Dr. E. Chiang marked boxes that indicated that Plaintiff did not have severe mental impairments. Tr. 13 (citing Tr. 172-186).

Plaintiff contends that the ALJ erred in the weights he assigned to Dr. Journigan's and Dr. Chiang's reports. Plaintiff contends that, because Dr. Journigan was Plaintiff's treating physician, the ALJ was required to give his opinions controlling weight unless the ALJ showed good cause to

5

disregard his opinions. Plaintiff also contends that, even if Dr. Journigan was not a treating physician, his opinions are entitled to full and controlling weight because he examined Plaintiff, testing substantiates his opinions, and his opinions are consistent with those of treating medical sources at Carlsbad Mental Health Association ("CMHA"). Plaintiff also contends that the ALJ erred when he gave greater weight to the PRT form completed by Dr. Chiang.

I disagree with Plaintiff's assertion that Dr. Journigan was Plaintiff's treating physician. The record indicates that Dr. Journigan conducted a psychological evaluation of Plaintiff on one occasion pursuant to a referral by Plaintiff's DVR counselor. Tr. 114. The Commissioner's regulations indicate that a "treating physician" provides continuing care, as distinguished from an individual who conducts a single consultative examination. *See* 20 C.F.R. § 416.927(d)(2). Accordingly, Dr. Journigan's report was not entitled to the controlling weight accorded a treating physician's opinions. *See id.* Even though Dr. Journigan was not a treating physician, his opinion was still entitled to consideration. *See* 20 C.F.R. § 416.927(d). Since Dr. Journigan actually examined Plaintiff, his opinions would also generally be entitled to more weight than the opinions of a non-examining physician such as Dr. Chiang. *See* 20 C.F.R. § 416.927(d)(1).

Despite the foregoing, I disagree with Plaintiff's contention that the ALJ erred by assigning "no weight" to Dr. Journigan's report and too much weight to Dr. Chiang's PRT form. First, Dr. Chiang relied, at least in part, upon Dr. Journigan's report in order to complete the PRT form. Although Dr. Chiang also relied upon a later assessment completed by Plaintiff's mental health treatment providers at CMHA, many of Dr. Chiang's conclusions are consistent with Dr. Journigan's. For example, both Dr. Journigan and Dr. Chiang noted that Plaintiff had no history of psychiatric hospitalizations or treatment, Tr. 119, 185, that she had a "chaotic and abusive childhood," Tr. 115,

185, that her IQ tested in the average range, Tr. 116, 185, and that her reading skills are at a high school level and her arithmetic skills are at a sixth grade level, Tr. 117, 185. Both Dr. Journigan and Dr. Chiang also concluded that Plaintiff has cyclothymic disorder.[1] Tr. 118, 175. Since Dr. Chiang's PRT form was based, at least in part, upon Dr. Journigan's evaluation, and since many of the findings in both reports are consistent, it seems illogical to conclude that the ALJ erred by giving no weight to Dr. Journigan's evaluation and too much weight to Dr. Chiang's PRT.

Additionally, even if I assume for purposes of argument that the ALJ erred in according diminished weight to Dr. Journigan's report, other substantial evidence supports the ALJ's determination that Plaintiff did not have a severe mental impairment. In this regard, Plaintiff received treatment through CMHA after Dr. Journigan evaluated her. On September 8, 2000, Plaintiff underwent an Integrated Assessment at CMHA. Tr. 157-59. The diagnostic impressions contained in her Integrated Assessment included panic attacks without agoraphobia, but no other disorders. Tr. 159. Plaintiff's records indicate that she saw a counselor from September 2000 through July 2001. Tr. 193-219. At her first counseling session on September 20, 2000, Plaintiff's counselor wrote that they had begun relaxation work for Plaintiff's panic attacks, and that Plaintiff would consider using a minor tranquilizer as needed. Tr. 219. Plaintiff made good progress in her therapy, and by January 10, 2001, her records reflected that she was "doing much better," "uses relaxation techniques well," and was intelligent, articulate and cooperative. Tr. 214. Her progress continued, and her records from almost all of her subsequent sessions indicated that she was doing well. Tr. 205-13. I find that the foregoing evidence, provided by Plaintiff's treating counselors, provides

---

[1] Dr. Chiang also concluded that Plaintiff has panic disorder. Tr. 185. This conclusion was based upon the mental health assessment completed by Plaintiff's CMHA provider. *See* Tr. 157-59.

substantial support for the ALJ's determination that Plaintiff did not have a severe mental impairment during the relevant time period. Accordingly, any error the ALJ may have committed in assigning diminished weight to Dr. Journigan's evaluation was harmless.

For the foregoing reasons, I reject Plaintiff's argument that the relative weights the ALJ assigned Dr. Journigan's evaluation and Dr. Chiang's PRT constitutes reversible error.

### 2. Although the ALJ Committed Factual and Legal Errors in his Analysis of Plaintiff's Mental Health Treatment, Substantial Evidence Supports his Determination that Plaintiff Did Not Have a Severe Mental Impairment

The ALJ also determined that Plaintiff did not have a severe mental impairment for the following reasons. The ALJ noted that Plaintiff received mental health counseling at CMHA from September 2000 through at least April 2001. Tr. 14. The ALJ then wrote that, although Plaintiff was instructed in April 2001 to return in one month, "there are no subsequent mental health records in the file. Therefore, I reasonably infer that the claimant failed to follow prescribed medical advice. Further, her failure to return for additional counseling sessions refutes her allegedly disabling anxiety or depressive disorder and raises doubt regarding her overall credibility." *Id.* Plaintiff contends that the ALJ erred when he found that Plaintiff failed to return for mental health counseling after April 2001, and Defendant concedes that the ALJ erred in this regard. Indeed, the record indicates that Plaintiff saw her counselor at CMHA on May 22, 2001, Tr. 207, on June 19, 2001, Tr. 206, and again on July 31, 2001, Tr. 205.

Not only was the ALJ factually incorrect when he found that Plaintiff did not return for counseling after April 2001, but his credibility analysis was also legally insufficient. In this regard, the ALJ could not properly discount Plaintiff's credibility based on a failure to pursue treatment without first considering the reasons why she may have failed to do so. Social Security Ruling 96-7p

addresses the manner in which the credibility of a claimant's statements about his or her symptoms must be assessed. With respect to a claimant's medical treatment history, SSR 96-7p provides:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following treatment as prescribed and there are no good reasons for this failure. *However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.* The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

(Emphasis added.) Even if the ALJ was factually correct when he found that Plaintiff failed to continue mental health treatment, he never addressed any reasons why she might have done so. Thus, the portion of the ALJ's step two analysis that addresses Plaintiff's failure to pursue medical treatment is both factually and legally insufficient. Defendant contends, however, that regardless of the ALJ's errors, other evidence still supports his determination that Plaintiff's testimony about the severity of her mental impairments lacked credibility.

Defendant first asserts that the fact that Plaintiff missed some counseling appointments after April 2000 - the date when the ALJ believed Plaintiff ceased attending counseling sessions - detracts from her credibility. I cannot accept this argument, for Defendant simply ignores the reasons why Plaintiff may have missed some of her counseling appointments. Plaintiff's counselor at CMHA made a note dated May 8, 2001 that indicates that Plaintiff called to cancel her appointment. Tr. 208. The reason Plaintiff canceled her appointment was that she took a Xanax pill and was afraid to drive. *Id.* Plaintiff's counselor noted that this was an "appropriate decision." *Id.* Moreover, when Plaintiff

9

spoke to her counselor on that date by telephone, they discussed what was happening with Plaintiff's family and also "reviewed anxiety prevention/reduction techniques over the phone." *Id.* At Plaintiff's next counseling session on May 22, 2001, Plaintiff's counselor wrote that Plaintiff had missed her last two visits "due to anxiety related incidents." Tr. 207. Given these notes in the record, I cannot agree that the fact that Plaintiff missed counseling appointments detracts from her credibility.

Defendant also contends that the ALJ's credibility determination should not be disturbed because other substantial evidence supports his determination that Plaintiff does not have a severe mental impairment. According to Defendant, the substantial evidence that supports the ALJ's credibility determination includes Plaintiff's testimony about her daily activities, the fact that her mental health counseling record dated June 19, 2001 indicates that she was "doing extremely well" and was preparing for termination of her treatment sessions, the fact that Plaintiff was able to attend college and do homework for more than 40 hours per week, and that she maintained a 3.3 grade point average. In analyzing a claimant's credibility, an ALJ need not set forth "a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel,* 206 F.3d 1368,1372 (10th Cir. 2000). Rather, an ALJ's analysis is sufficient if he or she identifies the specific evidence relied upon in evaluating the claimant's credibility. *Id.* Although I have previously found that the ALJ erred when he relied upon Plaintiff's purported failure to pursue treatment in discounting Plaintiff's credibility, the ALJ also cited Dr. Chiang's PRT form and records of Plaintiff's treatment at CMHA as support for his finding that Plaintiff did not have a severe mental impairment. Tr. 13-14. The ALJ also cited, albeit in a another part of his decision that discusses Plaintiff's RFC, evidence indicating that Plaintiff did well in college. Tr. 15. I find that a reasonable mind could accept the foregoing evidence as adequate to support the conclusion that Plaintiff did not have a severe mental impairment. Accordingly, although

the ALJ erred when he relied upon Plaintiff's purported failure to continue medical treatment in order to discount her credibility, I find that his step two determination that Plaintiff did not have a severe mental impairment is supported by other substantial evidence. Accordingly, I find that the ALJ's error in assessing Plaintiff's credibility was harmless.

### B. Whether the ALJ Erred in Assessing Plaintiff's RFC at Step Four

At step four of the sequential analysis, the ALJ was required to assess Plaintiff's RFC and then determine whether, in light of that RFC, Plaintiff could perform her past relevant work. *See Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir. 1996). The ALJ determined that Plaintiff retains the RFC "for a limited range of light work that involves limited pushing and/or pulling with her left leg; lifting and/or carrying up to 10 pounds occasionally and frequently; standing and/or walking up to two hours during a regular workday; sitting up to six hours during a workday; stooping, balancing, kneeling, and climbing stairs occasionally; no crawling or climbing ropes, ladders, scaffolding; and no working at hazardous job sites." Tr. 16-17. Plaintiff contends that the ALJ committed several errors in assessing her RFC. I will address each contention below.

### 1. The ALJ Erred When he Inferred That Plaintiff's Foot Impairment Did Not Pose Much of a Problem Based Upon her Alleged Failure to Pursue Medical Treatment

In assessing Plaintiff's physical RFC, the ALJ considered records of Plaintiff's treatment by Dr. Michael Federico, who is a podiatrist. *See* Tr. 14-15. The ALJ noted that Plaintiff saw Dr. Federico in February, March and September of 2000. Tr. 14. Because the ALJ did not find records of treatment after September 2000 in Plaintiff's file, the ALJ wrote:

> Thus, I reasonably infer that the claimant did not seek medical attention for her left ankle/foot after September 2000. It is also reasonable for me to infer that the claimant's left ankle/foot pain did not pose that much of a problem for her given the

lack of medical attention.

Tr. 15. Plaintiff contends that the ALJ committed at least two errors when he made these findings. First, Plaintiff contends that in light of testimony she had given at the hearing, the ALJ should have requested additional records from Dr. Federico instead of assuming there were no additional records after September 2000. Second, Plaintiff contends that the ALJ erred when he discounted evidence relating to the functional limitations that result from her foot pain based upon her supposed failure to continue treatment without first addressing her testimony that she cannot afford medical treatment. For the following reasons, I agree with both of Plaintiff's contentions.

At the hearing before the ALJ, which was held on December 6, 2001, Plaintiff testified that she had a follow-up appointment with Dr. Federico approximately six months before the hearing. Tr. 239. Plaintiff's testimony therefore indicated that she had seen Dr. Federico in approximately June 2001. This testimony should have alerted the ALJ that additional records after September 2000 might be available. Social Security Ruling 96-8p requires that "[t]he adjudicator must . . . make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Moreover, applicable regulations provide that when evidence from a treating physician is insufficient for the decisionmaker to determine whether the claimant is disabled, the Administration "will first recontact [the claimant's] treating physician . . . to determine whether the additional information we need is readily available." 20 C.F.R. § 416.912(e)(1). The ALJ's decision indicates, however, that the ALJ failed to take any additional steps to determine whether Plaintiff had seen Dr. Federico after September 2000. Because Plaintiff's testimony indicated that she had seen Dr. Federico in approximately June 2001, I find that the ALJ should have attempted to secure additional records from Dr. Federico rather than simply assuming that Plaintiff did not see Dr. Federico after September 2000.

Even though he failed to contact Dr. Federico to determine whether Plaintiff had received treatment after September 2000, the ALJ further assumed that Plaintiff's "left ankle/foot pain did not pose that much of a problem for her given the lack of medical attention." For the following reasons, I also find that the ALJ erred in discounting the severity of her pain based on her alleged failure to pursue treatment without considering the reasons why Plaintiff might have failed to seek treatment.

On September 7, 2000, Dr. Federico wrote that he advised Plaintiff that "[s]he only has two choices, that is orthotic therapy or subtalar fusion." Tr. 161. At the hearing before the ALJ, Plaintiff testified that she had received a custom-made orthotic, but that Dr. Federico had advised her that it only had a shelf-life of six-months to one-year. Tr. 239. Plaintiff also testified that Dr. Federico had advised her that, while the orthotic would make it easier for her to walk, the only real solution to her problem was surgery. Tr. 240. Plaintiff further testified at the hearing that she cannot afford to have the surgery.[2] *Id.* As I have previously noted, Social Security Ruling 96-7p states that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." It is clear that inability to afford treatment should be considered in assessing a claimant's credibility, SSR 96-7p, and may provide a justifiable excuse for failure to obtain treatment, *Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir. 1985). Indeed, the record in this case suggests that Plaintiff may have provided a justifiable excuse for her failure to continue treatment with Dr. Federico. Since Plaintiff exhausted one of her two treatment options

---

[2]With regard to her financial condition, Plaintiff also testified that DVR was paying for her mental health counseling, and that she would not be able to afford it otherwise. Tr. 246-47.

when she began using an orthotic, her only remaining treatment option was to have the surgery that she testified she could not afford. The ALJ in this case, however, failed to address Plaintiff's explanation that she cannot afford to have surgery. I find that his failure to do so constitutes reversible error.

### 2. The ALJ's Determination That Plaintiff's Foot Impairment Did Not Affect Her Ability to Sit, Stand, Walk, Bend, Reach, Etc., is Not Supported by Substantial Evidence

The ALJ concluded that Plaintiff's "left ankle/foot pain did not affect her ability to sit, stand, walk, bend, reach, etc., for vocationally-relevant time periods." Tr. 15. Plaintiff contends that this finding is "totally inconsistent" with Dr. Federico's findings. The ALJ apparently based his conclusion that Plaintiff's foot impairment did not affect her ability to sit, stand, walk, bend, reach, etc., on the following. The ALJ noted that Dr. Federico's records in February and March of 2000 indicated that Plaintiff had a calcaneal fracture of her left foot and subtalar joint arthritis, and that he recommended an orthotic device. Tr. 14 (citing Tr. 130-31). The ALJ also noted that Plaintiff did not return to Dr. Federico until September 2000, at which time Plaintiff was still waiting for approval from DVR of an orthotic. *Id.* The ALJ wrote that at that September 2000 visit, Plaintiff had limited subtalar range of motion but there were no signs of ankle instability. *Id.* (citing Tr. 161). The ALJ then wrote that "after examining the claimant's left foot, Dr. Federico stated that he would see her back only as needed. Hence, I find that Dr. Federico did not think that the claimant required ongoing medical attention for her left ankle/foot, and he did not find any objective abnormalities involving her back, hips, knees, etc." Tr. 14. For the following reasons, I agree with Plaintiff that the ALJ's conclusions do not accurately reflect Dr. Federico's findings.

First, the ALJ erred when he determined that Plaintiff had limited subtalar range of motion

but that there were no signs of ankle instability in September 2000. The note indicating that Plaintiff had limited subtalar range of motion but no signs of ankle instability was actually made on March 9, 2000. Tr. 161, 130. In March, Dr. Federico also wrote that Plaintiff "had minimal inversion and eversion of the left sub talar joint." Tr. 161, 130. However, at Plaintiff's September 2000 visit, Dr. Federico wrote:

> [Plaintiff] now states that she feels like her foot is severely rolling out, especially in the morning, and she has lateral foot pain, secondary to lack of shock absorption. She is getting a sural neuritis with numbness of the 4th and 5th toes. She is stating because of the way her foot hits the ground, she is beginning to get left knee, hip and low back pain, and Achilles' tightness. The patient is guarding every step. She walks with a very intalgic limp and the extensor tendons are beginning to pitch up, and she may be getting a stenose-tino synovitis. She states the foot hurts all the time from compensatory walking. She is walking very laterally on the left side. In addition, she is now leaning more to the right. She is creating some discomfort and neuraligia to the forefoot on the right side, especially to the 4th and 5th toes.

Tr. 161. Dr. Federico's notes therefore indicate that Plaintiff's foot condition had deteriorated between March and September 2000. A letter written by Dr. Federico on October 10, 2000 in an effort to help Plaintiff obtain financial assistance for an orthotic seems to confirm this. In that letter, Dr. Federico wrote that due to the delay in Plaintiff obtaining an orthotic, her subtalar joint continued to stiffen, her "achilles tendon is becoming short and she is acquiring an equinous deformity. All of the extensor tendons on the top of her foot are now beginning to hurt. She is developing stenosing teno synovitis due to extensor substitution phenomenon and the foot hurts all of the time." Tr. 162.

Second, contrary to the ALJ's suggestion, Dr. Federico did not state that he found no objective abnormalities involving Plaintiff's back, hips and knees. While nothing in Dr. Federico's treatment records indicates that Plaintiff *did* have objective abnormalities in her back, hips, and knees, the absence of evidence is not evidence, and cannot support the ALJ's conclusion. *See Thompson*

*v. Sullivan,* 987 F.2d 1482, 1491 (10th Cir. 1993).  Furthermore, in a letter dated October 10, 2000, Dr. Federico wrote that the way Plaintiff walked caused Plaintiff to suffer "compensatory bursitis in the knee and severe pain in her hip."  Tr. 162.  Dr. Federico also wrote that Plaintiff "has back pain almost all of the time due to her antalgic gait."  *Id.*  These statements appear to contradict the ALJ's conclusion that Dr. Federico found no objective abnormalities involving Plaintiff's back, hips, and knees.

Third, the ALJ's conclusion that Plaintiff did not need ongoing care because Dr. Federico told her he would see her only as needed ignores other information in the record.  In this regard, Dr. Federico advised Plaintiff in September 2000 that her only choices were to use an orthotic, or to have surgery.  Tr. 161.  At the hearing before the ALJ, Plaintiff testified that she had begun using an orthotic.  Tr. 239.  Plaintiff also testified that Dr. Federico had advised her that, while the orthotic would make it easier for her to walk, the only real solution to her problem was surgery.  Tr. 240.  Plaintiff further testified at the hearing that she cannot afford to have the surgery.  *Id.*  Dr. Federico was unquestionably aware of Plaintiff's financial condition, for he wrote a letter on October 10, 2000 in which he sought to help Plaintiff get financial assistance to pay for the orthotic.  *See* Tr. 162-63.  Thus, the fact that Dr. Federico told Plaintiff he would see her only as needed did not mean that Plaintiff did not require further care; to the contrary, the evidence indicates that it was Dr. Federico's opinion that Plaintiff would need surgery in the future to correct her foot impairment.

Fourth, the letter Dr. Federico wrote on October 10, 2000 to try to help Plaintiff get financial assistance to pay for an orthotic is also inconsistent with the ALJ's conclusion that Plaintiff's "left ankle/foot pain did not affect her ability to sit, stand, walk, bend, reach, etc., for vocationally-relevant time periods."  Tr. 15.  In his October 10, 2000 letter, Dr. Federico wrote that Plaintiff had not

16

walked normally since her foot injury in November 1998, and "continues to walk with a severely antalgic gait." Tr. 162. Dr. Federico also wrote that, because of the way Plaintiff walked, she was getting compensatory bursitis in the knee, severe pain in the hip, back pain, foot pain, and numbness in her 3rd, 4th and 5th toes secondary to a sural neuralgia. Tr. 162-63.

In view of the foregoing discussion, I find that the ALJ's determination that Plaintiff's foot impairment "did not affect her ability to sit, stand, walk, bend, reach, etc., for vocationally-relevant time periods" is not supported by substantial evidence.

### C. Whether the ALJ Erred in Discounting Plaintiff's Credibility Based Upon her Participation in Vocational Rehabilitation Services

Plaintiff's final argument is that the ALJ erred when he found that her successful participation in a vocational rehabilitation program sponsored by the New Mexico Division of Vocational Rehabilitation served as indicia that Plaintiff was "lying about her disability and inability to work." As support for her argument, Plaintiff cites 42 U.S.C. § 425(b) and 20 C.F.R. § 404.316(c)(1)(ii). However, the statute cited by Plaintiff states that an individual's benefits will not be *terminated* or *suspended* in certain circumstances when the individual participates in a vocational rehabilitation program. 42 U.S.C. § 425(b). Similarly, the regulation cited by Plaintiff indicates that benefits will be *continued* in certain circumstances where the individual is participating in a vocational rehabilitation program. 20 C.F.R. § 404.316(c)(1)(ii). These words indicate that the statute and its implementing regulation apply to individuals who are already receiving benefits. Because Plaintiff points to no authority that supports the proposition that the ALJ could not discount her initial claims of disability based upon her successful participation in a vocational rehabilitation program, I cannot accept her argument.

17

### V.  Conclusion and Summary

In sum, I find that the ALJ erred at step four of the sequential analysis when he inferred that Plaintiff's foot impairment did not pose much of a problem for her because she purportedly failed to continue medical treatment.  I further find that the ALJ's step four finding that Plaintiff's foot impairment did not affect her ability to sit, stand, walk, bend, reach, etc., for vocationally relevant time periods, is not supported by substantial evidence.

Accordingly, this matter shall be remanded to the Commissioner of Social Security to conduct further proceedings, which shall include:

1)  At step four of the sequential five-step analysis, the Commissioner should re-assess Plaintiff's residual functional capacity.  Before doing so, the Commissioner should obtain any additional records of treatment from Dr. Michael Federico that may exist, and the Commissioner should consider all records from the relevant time period in her assessment.  Additionally, the Commissioner should not draw any inferences about Plaintiff's symptoms or their functional effects from a failure to pursue medical treatment without first considering any explanations Plaintiff provided, or other information in the case record, that may explain any failure to obtain medical treatment.

2)  At step four of the sequential five-step analysis, the Commissioner should also re-consider the finding that Plaintiff's "left ankle/foot pain did not affect her ability to sit, stand, walk, bend, reach, etc., for vocationally-relevant time periods."  In doing so, the Commissioner should re-assess all of the evidence in the record relating to Plaintiff's foot impairment in light of the discussion above.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision [docket # 11] is **GRANTED IN PART,** and this matter shall be remanded to the Commissioner of Social Security for further proceedings in accordance with this Memorandum Opinion and Order.

_____
**W. DANIEL SCHNEIDER**
**UNITED STATES MAGISTRATE JUDGE**